The case that we're hearing this morning is United States v. Leon W. Grant, and counsel for Mr. Grant can begin whenever you're ready. Good morning, Your Honors. May it please the Court, Pamela O'Leary Tower on behalf of Leon Grant. Mr. Grant and I have waited a long time for this day, and now I feel like I have nothing to say except I'd like to thank the government for their concession, well aware that neither party can bind the Court. You got the opinion you wanted from the Supreme Court, so you sort of didn't have to wait for us. In a matter of speaking, Your Honor, yes. Let me ask you a couple questions about it. First, just a little side question. On the plain error doctrine, since there was no objection below to the use of rehabilitation as a factor, my memory is right on that, isn't it? That's correct, Your Honor. I suppose there's no question, at least I think there's probably no question, that you can – well, maybe there is. Before Tapia came down, you had Duran, so there was no error, no reason to object to the judge considering rehabilitation. That's correct. After Tapia, the error might be thought to be plain, except that the Fifth Circuit recently held that Tapia doesn't apply to the length of a sentence on revocation. Is it plain enough for us to reverse? It is, Your Honor. I disagree with, and I think the government disagrees, with the analysis of the Fifth Circuit, all due respect, in Breland. I think the error is plain in this case. Also, if it's not plain enough, I think we're also covered by, in the failure to object for counsel below, United States v. Autry, this Court's opinion in regards to agreeing to look and review its sentences for substantive reasonableness even if there was no objection below. And I think both the government and I cited Autry in our briefs. Could you give us, if you instead of us got to write the opinion in this case, could you recite the paragraph that you would include that addressed the Fifth Circuit opinion? I'm not that swift on my feet, Your Honor. I'm sorry. Do a quick, rough draft, or I'll try to dictate the paragraph. We've got to say why the Fifth Circuit is wrong if we go your way and the government's way. Okay. I guess Breland just got it. Is the Fifth Circuit judgment final? I checked, Your Honor, to see if anybody on Pacer had a petition for rehearing or for rehearing en banc, and the Pacer docket didn't show any activity. So I think the mandate issued. Has the time run? I believe so. So it is final. I could be wrong, but I think so. And I don't know that I've seen them in light of the government's position in their supplemental letter brief to the Court, which is different, obviously, than the position of the government in Breland. Okay. So go ahead and give me a rough draft now. Of why Breland should be? Our paragraph that says why we don't agree with Breland. May I reserve and have a moment? Okay. Let me ask you something else and then address it, if you can, and reserve otherwise. It's kind of interesting that everybody was getting it wrong before Tapia came down, including us, and that some circuits, like the Fifth, they're still getting it wrong. And I want to try to give you some insight from the point of view of a former trial judge about why. Everybody thought prison was partly for rehabilitation. I even got letters sometimes from people I sent to prison thanking me and saying they got what they needed in the way of programs and they shaped up and they got their GED or associate's degree or something, and they were really appreciative that I sent them to prison. And of course, the original idea with the Quakers was they'd be penitent. That's why they called them penitentiaries, and they would rehabilitate themselves by reading the Bible and reflecting on what they had done. And so it seems funny what Congress did, saying we have to recognize that it's not appropriate for rehabilitation. And I suspect that that's why the district judge here and so many others and so many other ways. Can you explain why prison isn't appropriate for rehabilitation? Well, I think rehabilitation is a very large word. It covers many of the programs Your Honor just spoke of. And like Your Honor, I received the same letters from my clients thanking me, saying that it changed their lives and talking about how they all have jobs now when they get out because of the programs that they were able to attend and complete in the federal prison system. Rehabilitation under TAPIA is drug and alcohol and mental health. And I think that that's basically, I read it to be more narrowly circumscribed to address those issues. And I believe that the studies that they talk about in amicus and all the briefing in TAPIA and just common sense is that you can take a horse to water, but you can't make them drink. And TAPIA is a perfect example. Ms. TAPIA was the judge, you know, rightfully so, thought she needed treatment, drug and alcohol, substance abuse treatment, and probably mental health. She rejected and refused that treatment, as is her right. He asked her to be designated, as they can only do, recommend designation to a facility, in that case Dublin in Oakland, that would offer that program. She never changed her mind. She never relented. She did not want treatment. So there's that issue. You cannot, you know, force a horse to drink even to get a drink. This is the First Circuit's idea that it's a futility. You can't control the Bureau of Prisons. You also can't control the prisoner in this way. Exactly. And the other thing, too, I think, at least with regards to mental health, alcoholism, and drug addiction, is unlike educational programs or vocational programs, we have a history, a jurisprudential history of not approving, incarcerating, or imprisoning people who are mentally ill, people who are addicts, and people who are alcoholics. So we have two social constructs going on here that I think differentiates the individuals in Tapia and Mr. Grant, who is a paradigm of an alcoholic and an addict in need of treatment on the outside, and other prisoners who are able to avail themselves of so-called rehabilitation within the prison system in the form of education and vocational programs. And I believe that that's a significant distinction because of the Supreme Court's rejection of statutes in other states that authorize incarcerating dope fiends. For example, California has one of the most outrageous statutes, and it's actually still on the books. Things of, you know, that type of thing. It may still be on the books, but we've rejected that as a method of treating these individuals because it is treatment, not education. Or it's a combination, but it's more the treatment paradigm. But again, you can't make people do it. So not only can you not make people get treatment, you can't make the Bureau of Prisons give them treatment. So we have two can'ts that are operating against us. Okay, thanks. And maybe during your reserve. I'll take a look at it. I'm sorry I'm not better prepared, Your Honor. Do you have any questions? Counsel, in an individual case, though, if a prisoner wanted medical treatment, it would be better for the superintendent to deny it. Wouldn't it? I'm sorry, Your Honor? If the prisoner had a condition that required medical treatment, it would be error for the prison not to meet that challenge and have it cured or taken care of. That's correct, Your Honor. The warden is responsible for the health and maintenance of the prisoner. That's correct, Your Honor. Okay. Thank you. You may reserve the remainder of your time. You have a little under two minutes left. May it please the Court. My name is Sangita Rao. I'm with the Criminal Appellate Section at the Department of Justice, and I represent the United States. The government agrees with defendants that this case should be remanded for a recession day. Excuse me, counsel. Since you and defense counsel agree, my questions are the same, and you've had more time to think about them. So why don't you recite the paragraph that you would write if you were writing the opinion that explained why the First Circuit was right and the Fifth Circuit was wrong. The analysis of Breland didn't consider first the text and then it considered – did not give enough weight to the reasoning in Tapia. First, the text. Looking at 3582, it applies when the court imposes a term of imprisonment and then in determining the length of a term of imprisonment. Revocation imprisonment looks like a term of imprisonment. It is confinement, and that's what the court in Tapia said imprisonment was. It applies on its plain terms. There are two strong contextual indications about the meaning of term of imprisonment that Breland also did not consider. First, the neighboring subsections of 3583 refer to revocation imprisonment as a term of imprisonment. Particularly, 3583G deals with mandatory revocation of supervised release. And it refers to the time a defendant serves in prison as a term of imprisonment. Perhaps even more tellingly, subsection K refers to the time a defendant serves certain sex offenders when their supervised release is revoked. It instructs a court to impose a term of imprisonment under subsection E3. So it specifically references E3 and refers to revocation imprisonment as a term of imprisonment. In addition to the neighboring subsections providing contextual clues as part of the textual analysis, there are all the other sentencing statutes that refer to a term of imprisonment. And both this Court and the BOP have used those statutes to administer revocation imprisonment sentences, and they're necessary to administer those sentences. They govern such things as when a prison term starts, when a defendant is released, whether a sentence should be served consecutively or concurrently, how good time credits should be calculated. If revocation imprisonment is not a term of imprisonment under all those statutes, there's a huge vacuum. Could you also address – I think you pretty much covered the ground on that, haven't you, that you had to say? Yes, about 3582, and then I would turn to Tapia. And what Breland said about Tapia, well, Tapia relied heavily on the textual analysis and also it found equally illuminating the absence of power in the district court to require either that BOP provide treatment or that the defendant receive treatment in prison. In contrast, when a defendant is out on supervised release or out on probation, out of prison, the district court does have authority to require treatment be received by the defendant. So the Tapia court looked at that textual difference in the statutes and said that that power, the lack of power of district courts to require treatment was equally illuminating in leading the Tapia court to the conclusion that 3582A precluded a district court from using rehabilitation to impose or lengthen imprisonment. That analysis applies equally to – Okay. I was struck by the Fifth Circuit's reliance on pre-Tapia cases such as – I think it's called Gidding or Giddings. In your view, do those cases survive Tapia, the ones on which the Fifth Circuit relied? No. We don't think that they survive Tapia. Just like the government's analysis, we don't think survives Tapia. The Breland courts – another problem with the Breland court is that it relied on Giddings. And Giddings – there's two things. Giddings actually was interpreting a prior statute as well. And one of the things Giddings heavily relied on was the fact in Giddings that the statute at that time, 3583, said that a defendant should be required to serve in prison the term of supervised release. And at the time that the statute, when it said that, which was pre-1994, it didn't say the term of supervised release authorized by a statute for the offense. And this Court, in Zinadakis, actually found that distinction important. And – Totally different context. I mean, it's – they weren't addressing our problem. It's just a pulled quote. Well, it's true that Zinadakis wasn't addressing this. You're pulling a quote out of Tapia that just has nothing to do with the decision we have to make in this case. I think the analysis is relevant that Zinadakis was looking at the term of imprisonment and whether it applied to revocation imprisonment. And we don't think it's controlling. We agree with the Court, with Your Honor, to that extent. But we do think that it's persuasive that this Court before has looked at – All right. Do you have anything to say about the plain error issue? The government – I suppose we'd have to say not only that there's plain error here, but that the Fifth Circuit's decision is not only erroneous, but plainly erroneous. We have two responses. First, the government is exercising its discretion to not invoke plain error as an obstacle to defendant obtaining relief. So we think that this Court can stop there, that the government is – or it can exercise its own discretion. So you're, on behalf of the government, waiving the failure to object? Yes. That's correct. Okay. You had another point to make on that? I could address plain error if the Court chose not to accept the government's waiver. So this Court would look at error at the time of appeal, not at the time of sentencing because of Duran. And at the time of appeal, while there is a circuit conflict, the circuit conflict is narrow, one-to-one. And it's different here because the government is agreeing with the defendant. So we think in this very narrow circumstance where there's a small circuit conflict, the government and the defendant agree on the proper interpretation of the statute, Greeland itself, the circuit going – the opinion going the other way, does not consider Molinaro and did not have the benefit of the government's views. It came down at about the same time. Let me ask you something else. I told you about my thank-you notes. I didn't know that Federal Defender's Offices got thank-you notes, too. And they weren't always because of programs, though they sometimes were. Sometimes it was just they shape up there because they've got a little time away from their old associates and their old way of life. Or sometimes they shape up because it's like living in a toilet for – well, I had an armed robber who had a shootout once. And he went to prison, he came out, and now he's a straight-up citizen. He just doesn't want to live in a toilet anymore. He wants to live in his own apartment. The government isn't saying that rehabilitation cannot occur in prison, and nor are we saying that the Bureau of Prisons should not try to encourage rehabilitation in prison. When a defendant is in prison, rehabilitation programs do go on. You're not addressing the point. But – But here we are, people who have experience sentencing people who say prison itself can and sometimes can be and sometimes is quite rehabilitative. And here Congress is saying it's not appropriate to consider it. And it just seems funny. What were they thinking that's so different from our experience? At the time the Sentencing Reform Act was passed, the model of sentencing at the time was rehabilitation-based. Courts put people in prison and parole boards let people out when they believed that the prisoner was rehabilitated. Congress, in the Sentencing Reform Act, rejected imprisonment as a means of rehabilitation. It rejected that model, despite the fact that I'm sure there are many instances when district courts know that it might help the defendant. But Congress made the choice that as a sentencing model – Why? At the time, there was a lot of studies about the global effectiveness of treatment programs and showing that it did not work. The idea that you live with all those bad people, it's a school for crime, that whole Time Magazine theory of criminology? Well, it certainly was one of the theories that rehabilitation in prison simply didn't work. And they believed in rehabilitation, but they believed if it was going to be compelled, that it needed to be compelled outside the prison setting. Okay. Thank you, counsel. You have about two minutes left. I confess that I was listening to counsel's argument and your questions, and I really can't explicate what the Court just said. What I wanted – what bothered me about Breland was they just brushed off the judicial incapacity portion of the Tapia opinion. In other words, even if Breland – and actually, if you read Justice Souter's opinion in the First Circuit, he goes right up to the wall and says, but for the judicial incapacity section of Tapia, we agree with the government. And he listed a number of reasons why they agree with the government's position that Tapia should not apply to supervised release revocations. But he stopped at the fact that even if Tapia did apply to – I mean, that 3582 didn't apply to supervised revocation resentencings, the judges have no power to implement their sentence. And Breland just blows that off. And I was wondering out loud, driving down here, what option this Court does have, no offense intended. I kind of felt like you're – because of that third prong in Tapia, you're somewhat bound, because Judge Ezra cannot implement this sentence as much as he would want to. Nobody faults him for his sentence per se. He's sentenced a lot of people. I've appeared before many times. That's my kuleana where I practice out there. And just for the record, to clarify, I'm not a Federal defender. I'm private, but I'm on the panel. And I do appreciate the Court's concerns. And we do get letters from our clients that do thank us for what we do and mentioning the programs. But I think the dichotomy here is between treatment per se and vocational educational rehabilitation. And perhaps you can find some comfort in that. Roberts. My robber was a private client, actually. Thank you, counsel. We appreciate the arguments of both counsel. The case just argued is submitted. And we will stand adjourned.
judges: Beezer, Kleinfeld, Graber